**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD MODJESKI, derivatively on behalf of PLUG POWER INC., | |
| Plaintiff, | Case No.: 1:26-cv-486 (MAD/DJS) |
| vs. | |
| ANDREW MARSH, PAUL B. MIDDLETON, SANJAY K. SHRESTHA, MARK BONNEY, MAUREEN O. HELMER, PATRICK JOGGERST, GREGORY KENAUSIS, KAVITA MAHTANI, GEORGE C. MCNAMEE, KYUNGYEOL SONG, and GARY K. WILLIS | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| PLUG POWER INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Richard Modjeski ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Plug Power Inc. ("Plug Power" or the "Company"), files this Verified Shareholder Derivative Complaint against Andrew Marsh ("Marsh"), Paul B. Middleton ("Middleton"), Sanjay K. Shrestha ("Shrestha"), Mark Bonney ("Bonney"), Maureen O. Helmer ("Helmer"), Patrick Joggerst ("Joggerst"), Gregory Kenausis ("Kenausis"), Kavita Mahtani ("Mahtani"), George C. McNamee ("McNamee"), Kyungyeol Song ("Song"), and Gary K. Willis ("Willis") (collectively, the "Individual Defendants" and together with Plug Power, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Plug Power, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against

Defendants Marsh, Middleton and Shrestha for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Plug Power, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Plug Power's current and/or former officers and directors from May 9, 2023 to January 17, 2024, both dates inclusive (the "Relevant Period").

2.      Plug Power is an energy company which provides hydrogen ecosystems to customers including hydrogen production, storage, and delivery. Since its inception in 1997, the Company has become the largest buyer of liquid hydrogen and has provided more than 72,000 fuel cell systems and over 275 hydrogen fueling stations.

3.      Plug Power maintains long-term agreements with customers like Amazon and Walmart for hydrogen fuel cells. These contractual obligations exceed Plug Power's internal production of hydrogen fuel. To fulfill its contractual obligations, the Company purchases liquid hydrogen from third-party suppliers and resells it to customers at a loss. The Company has sustained negative margins on its fuel delivery business while implementing this structure of

operations.

4.      In 2019 the Company announced plans to address its negative margins through the development of dedicated facilities to produce green hydrogen, liquefy it, and distribute it to its customers. The Company's plans were centered around several plants, the first being a 15-tons-per-day ("TPD") liquid green hydrogen plant in Woodbine, Georgia (the "Georgia Plant").

5.      The Company highlighted how the Georgia Plant would showcase the Company's reduced reliance on third-party suppliers of fuel and would be material to the improvement of its hydrogen fuel margins.

6.      However, the deadlines set for the start of production of liquid hydrogen at the Georgia Plant were unrealistic. Despite this, the Individual Defendants maintained expectations of when the Georgia Plant would begin production that did not match industry norms.

7.      Throughout the Relevant Period, the Individual Defendants made or caused the Company to make false and misleading statements that continued to highlight that production at the Georgia Plant was imminent. For example, on June 14, 2023, Defendant Marsh claimed, "*So the important item is Georgia will be putting out liquid at the end of the month*."[1]

8.      Unbeknownst to the general public the Company was struggling to fulfill payments to various suppliers, which caused critical parts to be delayed. The Company was also plagued with operational challenges that continued to delay key functions of the Georgia Plant's construction. As a result, the Georgia Plant would not begin producing hydrogen until January 2024.

9.      The truth fully emerged on January 17, 2024, when Seeking Alpha published a report highlighting downgrades from analysts and concerns related to the Georgia Plant's

---

[1] Unless otherwise noted, all emphasis is added.

3

buildouts. Seeking Alpha included a report by Morgan Stanley from that same day which stated, "Morgan Stanley analyst Andrew Percoco maintained his Underweight rating and $3 price target, anticipating downside to Plug's (PLUG) $2.1B revenue and 25% gross margin guidance for FY 2024 announced during its Q4 earnings call" and "further delays at Plug's green hydrogen production facility in Georgia could be announced, which would add to pressure on the growth and profitability profile of the company's green hydrogen business model."

10.    On this news, the price of the Company's common stock fell $0.30 per share, or approximately 9.9% from a closing price of $3.04 per share on January 16, 2024, to a closing price of $2.74 per share on January 17, 2024.

11.    Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the Company was not paying its suppliers; (2) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (3) these supply shortages were causing the Company's Georgia Plant to experience delays; (4) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of June; and (5) the Georgia Plant would not be ready to start producing hydrogen until January 2024. As a result of the forgoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.    The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts.

4

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former President to a securities class action lawsuits pending in the United States District Court for the Northern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Marsh's, Middleton's, and Shrestha's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Plug Power. Plaintiff has continuously owned Plug Power common stock since first purchasing shares on May 4, 2022.

### Nominal Defendant Plug Power

20. Plug Power is a Delaware corporation with principal executive offices at 125 Vista Boulevard, Slingerlands, NY 12159. Plug Power's common stock trades on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "PLUG."

### Defendant Marsh

21. Defendant Marsh has served as a Company director since April 2008 and as Chairman of the Board since March 2, 2026. Defendant Marsh previously served as the Company's CEO from April 2008 until March 2, 2026.

22. The Schedule 14A the Company filed with the SEC on June 9, 2025 (the "2025 Proxy Statement") stated the following about Defendant Marsh:

> Andrew J. Marsh has been serving as the Company's Chief Executive Officer since April 2008 and has been our director since 2008. As Chief Executive Officer, Mr. Marsh plans and directs all aspects of the organization's policies and objectives, and is focused on building a company that leverages Plug Power's combination of technological expertise, talented people and focus on sales growth and profitability

to continue the Company's leadership stance in the future alternative energy economy. Mr. Marsh also serves on the board of directors of Gevo, Inc., a publicly traded renewable chemicals and advanced biofuels company.

Previously, Mr. Marsh was a co-founder of Valere Power, where he served as chief executive officer and board member from the company's inception in 2001, through its sale to Eltek ASA in 2007. Under his leadership, Valere grew into a profitable global operation with over 200 employees and $90 million in revenue derived from the sale of DC power products to the telecommunications sector. During Mr. Marsh's tenure, Valere Power received many awards such as the Tech Titan award as the fastest growing technology company in the Dallas Fort Worth area and the Red Herring Top 100 Innovator Award. Prior to founding Valere, he spent almost 18 years with Lucent Bell Laboratories in a variety of sales and technical management positions.

Mr. Marsh is a prominent voice leading the hydrogen and fuel cell industry. Nationally, he is the former Chairman of the Fuel Cell and Hydrogen Energy Association, and was a member of the Hydrogen and Fuel Cell Technical Advisory Committee ("HTAC") within the Department of Energy's Hydrogen Program, which was disbanded in January 2021. HTAC was responsible for providing advice to the Department of Energy regarding its hydrogen and fuel cell program goals, strategies, and activities. Internationally, Mr. Marsh represents Plug Power in its role as supporting members of the Hydrogen Council, a global initiative of leading energy, transport and industry companies with a united vision and long-term ambition for hydrogen to foster the energy transition. Mr. Marsh holds a B.S. in Electrical Engineering Technologies from Temple University, an M.S. in Electrical Engineering from Duke University and an M.B.A. from Southern Methodist University.

We believe Mr. Marsh's qualifications to sit on our Board include his extensive experience with the alternative energy industry, as well as his experience in management positions.

**Defendant Middleton**

23.    Defendant Middleton has served as the Company's CFO and Executive Vice President since 2014 and as the Company's Chief Accounting Officer ("CAO") since May 2025.

24.    The 2025 Proxy Statement stated the following about Defendant Middleton:

*Paul B. Middleton* joined the Company as Chief Financial Officer and Executive Vice President in 2014 and, since May 2025, has also assumed the role of the Company's Chief Accounting Officer. Since October 2024, he has served on the board of directors of HyVia, the Company's joint venture with Renault SAS. Prior to Plug Power, Mr. Middleton worked at Rogers Corp., a global manufacturer and

distributor of specialty polymer composite materials and components, from 2001 to 2014. During his tenure at Rogers Corp., Mr. Middleton served in many senior financial leadership roles, including Corporate Controller and Principal Accounting Officer, Treasurer and Interim Chief Financial Officer. Prior to Rogers Corp., Mr. Middleton managed all financial administration for the tools division of Coopers Industries from 1997 to 2001. Mr. Middleton holds a Master of Science in Accounting and a BBA from the University of Central Florida. Additionally, he is a Certified Public Accountant.

**Defendant Shrestha**

25.     Defendant Shrestha served as the President of the Company from November 2024 until October 2025. Mr. Shrestha previously served as General Manager, Energy Solutions from January 2021 to November 2024 and as Chief Strategy Officer and Executive Vice President from April 2019 to January 2021.

26.     The 2025 Proxy Statement stated the following about Defendant Shrestha:

*Sanjay K. Shrestha* has served as the President of the Company since November 2024. Mr. Shrestha previously served as General Manager, Energy Solutions from January 2021 to November 2024 and as Chief Strategy Officer and Executive Vice President from April 2019 to January 2021. Prior to joining Plug Power, Mr. Shrestha served as the Chief Investment Officer of Sky Solar Holdings, which owned and operated solar projects in Japan, Europe and the Americas, and President of Sky Capital America, which owned and operated solar projects in North and South America, since 2015. Under his leadership, Sky Capital America built and acquired over 100MW of operating solar assets and secured a pipeline over 100MW. He also sourced various types of financing solutions to support this growth, including project debt, construction equity and long-term equity. Before Sky Capital America, he led the renewables investment banking effort at FBR Capital Markets (now known as B. Riley Financial, Inc.) since 2013. During 2014, and under his leadership, the firm was ranked among the top renewable energy underwriters in the United States. Prior to joining FBR Capital Markets, Mr. Shrestha was the global head of renewables research coverage at Lazard Capital Markets. During his tenure at Lazard Capital Markets, he was a member of the Institutional Investor All America Research team and was also ranked as one of the top five stock pickers on a global basis. Prior to Lazard Capital Markets, Mr. Shrestha was at First Albany Capital, where he built the firm's renewables and industrial research practice. Mr. Shrestha serves as an independent director on the board of directors of Fusemachines, an artificial intelligence talent and education solutions company. Mr. Shrestha currently serves on the board of directors of AccionaPlug S.L., which is the Company's joint venture with Acciona Generación Renovable, S.A., and Hidrogenii, which is the Company's joint venture with Niloco Hydrogen Holdings LLC, a wholly-owned subsidiary of Olin Corporation. Mr.

8

Shrestha received a Bachelor of Science and an honorary doctorate degree in 2022 from The College of Saint Rose. He brings to the Company more than two decades of experience in the broader clean tech sector.

**Defendant Bonney**

27.     Defendant Bonney has served as a Company director since 2023. He also serves as the Chair of the Audit Committee and as a member of the Regulatory Affairs Committee.

28.     The 2025 Proxy Statement stated the following about Defendant Bonney:

Mark J. Bonney has been a director of the Company since 2023. Mr. Bonney currently serves as President and Chief Executive Officer of On Board Advisors, LLC, a financial and strategic advisory firm. Since July 2020, Mr. Bonney has served on the board of directors of Tile Shop Holdings, Inc., a publicly traded specialty retailer of tile products and accessories. Prior to that, he served on the board of directors of Zix Corporation, a then-publicly traded provider of cloud email security solutions, from January 2013 until its merger in December 2021. Mr. Bonney also previously served as a director of SeaChange International, Inc., a provider of end-to-end video delivery and management software solutions, from August 2017 through December 2019, including as Executive Chair and principal executive officer from April 2019 through October 2019, and Independent Chairman from October 2019 through December 2019. From May 2018 until its merger in April 2019, he served as President and Chief Executive Officer and a director of RhythmOne plc (previously known as Blinkx and also known as RhythmOne Group), an online publicly traded provider of multi-screen digital advertising, where he also served as the Interim Chief Financial Officer from February 2019 to April 2019. Prior to that, Mr. Bonney served as President and Chief Executive Officer of MRV Communications, Inc., a publicly traded supplier of network equipment to the telecommunications industry, from December 2014 until its sale in August 2017 and as a director of MRV Communications, Inc. from April 2013 to August 2017. Mr. Bonney previously served as a director of Sigma Designs, Inc., a provider of system-on-a-chip semiconductor solutions for smart homes, from August 2012 through August 2015; Executive Vice President and Chief Financial Officer of Direct Brands, Inc., a direct to consumer media company, from 2010 to 2012; vice president and general manager of the Authentication Solutions Group of JDS Uniphase Corporation ("JDSU"), an optical technologies and telecommunications firm, from 2008 to 2010; and as a director from 2003 until 2005, and Executive Vice President and Chief Financial Officer from 2005 to 2008, of American Bank Note Holographics, Inc., an optical security device company, which was acquired by JDSU. Mr. Bonney has also previously held executive roles with technology companies, including President, Chief Operating Officer and a director of Axsys Technologies, Inc., a manufacturer of components and subsystems for aerospace, defense, data storage, medical and other high technology applications, from 1999 to 2002, and Chief Financial Officer of Zygo Corporation, a manufacturer of components for semiconductor, data storage

and industrial markets, from 1993 to 1999. Mr. Bonney holds a B.S. in Business from Central Connecticut State University and an M.B.A. from the University of Hartford.

We believe Mr. Bonney's qualifications to sit on our Board include his experience in finance, strategy, and executive leadership, having served various executive roles and as a director for several public companies.

**Defendant Helmer**

29.    Defendant Helmer served as a Company director since 2004. She also serves as the Chair of the Corporate Governance and Nominating Committee and the Regulatory Affairs Committee and as a member of the Audit Committee.

30.    The 2025 Proxy Statement stated the following about Defendant Helmer:

Maureen O. Helmer has been a director of the Company since 2004. Ms. Helmer worked at the law firm Barclay Damon, LLP until her retirement in 2021 as a senior member of the firm's energy and telecommunications Regulatory Practice Area. Prior to joining Barclay Damon, LLP, Ms. Helmer was a member of Green & Seifter Attorneys, PLLC. From 2003 through 2006, she practiced as a partner in the law firm Couch White, LLP and then as a solo practitioner. Ms. Helmer has advised international energy, telecommunications and industrial companies on policy and government affairs issues. In addition to serving as Chair of the New York State Public Service Commission ("PSC") from 1998 to 2003, Ms. Helmer also served as Chair of the New York State Board on Electric Generation Siting and the Environment. Prior to her appointment as Chair, Ms. Helmer served as Commissioner of the PSC from 1997 until 1998 and was General Counsel to PSC from 1995 through 1997. From 1984 through 1995, Ms. Helmer held several positions in the New York Legislature, including Counsel to the Senate Energy Committee. She also served as a board member of the New York State Energy Research and Development Authority, the New York State Environmental Board and the New York State Disaster Preparedness Commission during her tenure as Chair of the PSC from 1996 to 2003. In addition, she was Vice Chair of the Electricity Committee of the National Association of Regulatory Utility Commissioners ("NARUC") and a member of the NARUC Board of Directors. She was also appointed to serve as a member of the New York State Cyber-Security Task Force. She formerly served as a board member of the Center for Internet Security from 2012 to 2016, the Center for Economic Growth from 2008 to 2016, and New York Women in Communications and Energy from 1990 to 2016. Ms. Helmer earned a B.S. from the State University at Albany and a J.D. from the University of Buffalo Law School. She is admitted to practice law in New York.

We believe Ms. Helmer's qualifications to sit on our Board include her long history

10

of experience with energy regulation, policy and government affairs, and advising energy and industrial companies.

**Defendant Joggerst**

31.     Defendant Joggerst has served as a Company director since July 2023. He also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.

32.     The 2025 Proxy Statement stated the following about Defendant Joggerst:

Patrick Joggerst has been a director of the Company since July 2023. Mr. Joggerst is currently the founder and principal of J21 Consulting Group, a management consulting practice focusing on organization transformation and sales acceleration. From January 2018 until November 2021, Mr. Joggerst served as Chief Marketing Officer and Executive Vice President of Business Development at Ribbon Communications Inc., a publicly traded software, analytics and cloud solutions provider for communications services, which was created from the merger of Genband US LLC, a provider of carrier and enterprise network transformation and real-time communications solutions, and Sonus Networks, Inc., a publicly traded cloud-based communications distributor of mobile network operation and Microsoft solutions. Prior to his role with Ribbon Communications Inc., he served as an Executive Vice President of Global Sales and Marketing at GENBAND™ from January 2016 to December 2017 and as the Chief Marketing Officer and Executive Vice President from March 2015 to January 2016. Mr. Joggerst holds a B.S. in Foreign Service from Georgetown University, with a concentration in international commerce and finance.

We believe Mr. Joggerst's qualifications to sit on our Board include his more than 25 years of experience in various roles in the technology, software, marketing, and telecommunications sectors.

**Defendant Kenausis**

33.     Defendant Kenausis has served as a Company director since October 2013. He also serves as the Chair of the Strategy and Financing Committee and as a member of the Audit Committee and the Compensation Committee.

34.     The 2025 Proxy Statement stated the following about Defendant Kenausis:

Gregory L. Kenausis has been a director of the Company since October 2013. Dr. Kenausis is the founding partner and since 2005 has been the Chief Investment

11

Officer of Grand Haven Capital AG, an investment firm, where he is the head of research and trading activity and is responsible for managing the fund's operations and structure. He also has worked extensively as a business consultant with a focus on business development and strategy, as well as valuation. Dr. Kenausis earned a B.S. in Chemical Engineering from Yale University and a Ph.D. in Biomedical/Medical Engineering from the University of Texas at Austin.

We believe Dr. Kenausis' qualifications to sit on our Board include his background and senior level experience in financial investments, business development and strategy, management and equity capital markets.

**Defendant Mahtani**

35.    Defendant Mahtani has served as a Company director since 2022. She also serves as a member of the Audit Committee and the Strategy and Financing Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Mahtani:

Kavita Mahtani has been a director of the Company since 2022. Ms. Mahtani is Chief Financial Officer of HSBC Bank plc. In this role, Ms. Mahtani is responsible for the financial operations of HSBC Bank plc and all of its entities and operations, overseeing the financial functions, including accounting, regulatory reporting, stress testing and capital management. Prior to joining HSBC, Ms. Mahtani served in several leadership roles during her 13-year tenure with Citigroup, Inc., including Managing Director — Global Head of Asset and Liability Management, Chief Financial Officer, Global Corporate and Investment Banking, and Managing Director — Global Head of Financial Planning and Analysis, among others. Ms. Mahtani has also held roles with Morgan Stanley and Merrill Lynch & Company, Inc. Ms. Mahtani holds a B.S. in Economics from the University of Pennsylvania, The Wharton School, and an M.B.A. from the University of Chicago's Graduate School of Business.

We believe Ms. Mahtani's qualifications to sit on our Board include extensive experience with growth strategies, merger and acquisition implementation, and leadership.

**Defendant McNamee**

37.    Defendant McNamee has served as a Company director since 1997 and the Company's Lead Director since October 10, 2025. He previously served as the Chairman of the Board since 1997 until October 10, 2025. Defendant McNamee also serves as a member of the Compensation Committee, Corporate Governance and Nominating Committee, Regulatory Affairs

Committee, and Strategy and Financing Committee.

38.     The 2025 Proxy Statement stated the following about Defendant McNamee:

George C. McNamee serves as Chairman of the Company's Board of Directors and has served as such since 1997. He was previously Chairman of First Albany Companies Inc. and a Managing Partner of FA Tech Ventures, an information and energy technology venture capital firm. As an executive and director of numerous companies, Mr. McNamee has navigated technological change, rapid-growth, crisis management, team building and strategy. As a public company director, Mr. McNamee has led board special committees, chaired audit committees, chaired three boards and has been an active lead director. Mr. McNamee served on the board of directors of HyVia, the Company's joint venture with Renault SAS, from July 2021 to October 2024. He also served on several public company boards, including the boards of Mechanical Technology Inc. and the Home Shopping Network. He has been an early stage investor, director and mentor for private companies that subsequently went public, including MapInfo (now Pitney Bowes), META Group (now Gartner Group) and iRobot Corporation, where he served as a director from 1999 to 2016 and as lead director for the last 11 of those years. In 2011, Mr. McNamee was the first history major awarded the Yale Science and Engineering Association Distinguished Service Award. He served as a NYSE director from 1999 to 2004 and chaired its foundation. In the aftermath of the 1987 stock market crash, he chaired the Group of Thirty Committee to reform the Clearance and Settlement System. Mr. McNamee has been active as a director or trustee of civic organizations, including The Albany Academies and Albany Medical Center whose Finance Committee he chaired for 12 years. He is also a director of several private companies, a Sterling Fellow of Yale University and a Trustee of The American Friends of Eton College. He conceived and co-authored a book on the Chicago Conspiracy Trial. He received his Bachelor of Arts degree from Yale University.

We believe Mr. McNamee's qualifications to sit on our Board include his experience serving on technology company boards, his background in investment banking, which has given him broad exposure to many financing and merger and acquisition issues, and experience with the financial sector and its regulatory bodies.

**Defendant Song**

39.     Defendant Song served as a Company director from February 2021 until resigning on August 2, 2024.

40.     The Schedule 14A the Company filed with the SEC on April 26, 2024 stated the following about Defendant Song:

13

Kyungyeol Song has been a director of the Company since February 2021. Dr. Song is the Chief Operating Officer at PassKey, Inc., a US-based energy transition business entity of SK E&S Co., Ltd. Prior to his current position, Dr. Song served as the Senior Vice President in Energy Solution TF at SK Group Supex Council from February 2019 until August 2020 and was the Head of Quantum Growth TF at SK until 2022. Dr. Song also served as the Director of the McKinsey Energy Center from February 2007 until December 2018. Dr. Song received a Ph.D. in Control and Estimation Theory, Aeronautics and Astronautics from the Massachusetts Institute of Technology, a Master of Science in Aerospace Engineering from Seoul National University, and a Bachelor of Science degree in Aerospace Engineering from Seoul National University. Dr. Song was appointed to the Board by Grove Energy Capital LLC, a stockholder of the Company, pursuant to the Investor Agreement, dated as of February 24, 2021, which is described below.

### Defendant Willis

41.     Defendant Willis has served as a Company director since 2003. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee, Corporate Governance and Nominating Committee, Regulatory Affairs Committee, and Strategy and Financing Committee.

42.     The 2025 Proxy Statement stated the following about Defendant Willis:

Gary K. Willis has been a director of the Company since 2003. Mr. Willis previously served as the President from February 1992 to 1999 and the Chief Executive Officer from 1993 to 1999 of the Zygo Corporation. Mr. Willis served as a director of Zygo Corporation from 1992 to November 2000, including as Chairman of the board from 1998 to 2000. Mr. Willis also served as a director of Zygo Corporation from 2004 to 2014. Zygo Corporation, which was acquired in 2014 by Ametek, Inc., was a provider of metrology, optics, optical assembly, and systems solutions to the semiconductor, optical manufacturing, and industrial/automotive markets. Prior to joining Zygo Corporation, Mr. Willis served as the President and Chief Executive Officer of The Foxboro Company, a manufacturer of process control instruments and systems. Mr. Willis holds a Bachelor of Science degree in Mechanical Engineering from Worcester Polytechnic Institute.

We believe Mr. Willis' qualifications to sit on our Board include his extensive experience in management and director positions with similar companies, as well as his educational background in mechanical engineering.

### Relevant Non-Parties

14

43.    The Amended Complaint in the Securities Class Action captioned *In re Plug Power Inc. Securities Litigation*, Case No.: 1:24-cv-00406-MAD-DJS, in the United States District Court for the Northern District of New York incorporates statements from confidential former employees ("FEs") of Power Plug who offered their experiences.[2] The following are the confidential former employees whose statements are referenced throughout this complaint before this court.

*FE1*

44.    FE1 was employed at Plug Power as Senior Manager of Manufacturing from 2021 to 2024. FE1 was responsible for implementing standard operating procedures ("SOP"), sale inventory system, structured operational planning programs, organizing plant layouts, optimizing operational flow, and addressing other existing operational issues.  In the role as Senior Manager of Manufacturing FE1 led manufacturing for hydrogen fuel cell self-assemblies, supervised Plug Power's storage systems and electrolyzers, and new product introduction. FE1 reported to David Mindnich ("Mindnich"), Executive Vice President of Global Manufacturing of Power Plug, who in turn reported directly to Defendant Marsh.

*FE2*

45.    FE2 was a contractor and consultant on behalf of Plug Power from 2022 to 2023. FE2, on behalf of Plug Power, assembled fuel test stands, oversaw installation and connections, and worked on hydrogen pads. FE2 stopped working for Plug Power when payments from Plug Power ceased, resulting in roughly $500,000 in remaining unpaid invoices. FE2 attempted to contact Plug Power about payment but was unsuccessful.

*FE3*

---

[2] Former employee witnesses are all referenced using masculine pronouns to maintain their confidentiality.

15

46.    FE3 was employed by Plug Power as a Senior Floor Supervisor at the Company's Vista Plant from 2021 to approximately March 2023. FE3 was responsible for setting up the Vista facility, supervising managers and operations, constructing assembly lines to improve the efficiency of the battery assembly, and managing the shop floor. FE3 reported to Chris Kenny (Senior Director of Manufacturing Operations).

### FE4

47.    FE4 was employed by Plug Power from June 2022 to August 2024 as an Officer Manager and Senior Administrative Assistant. FE4 worked at Power Plug's West Concord, Massachusetts Electrolyzer Facility. FE4 was responsible for running the Success Program Manufacturer floor, office tasks, planning events, onboarding new employees, and supporting vice presidents with updates and projects. FE4 reported to Noelle DiPietro, Manager Executive Administration and previously to Cortney Mittelsteadt ("Mittelsteadt"), VP Electrolyzer Technology.

### FE6

48.    FE6 was employed by Plug Power from June 2023 to March 2025, first as the Commercial Finance Manager, and later as Senior Product Manager- Product Analytics. FE6's job duties were in both aspects of finance and product strategy. These responsibilities included analytical tool development, pricing strategy design, cost reduction initiatives, and supply agreement management. FE6 also interacted with data using PowerBI, Vena, and SAP from Plug Power's Enterprise Resource Planning system. While in his role as Commercial Finance Manger, FE6 reported to Jerry Cahill (Vice President of Finance), who reported directly to Defendant Middleton. FE6 also reported to Tony Sinkevich (Vice President of Finance). While working as Senior Product Manager, FE 6 reported to Glen Benson (Senior Systems Engineer).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and/or fiduciaries of Plug Power and because of their ability to control the business and corporate affairs of Plug Power, the Individual Defendants owed Plug Power and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Plug Power in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Plug Power and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Plug Power and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Plug Power, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Plug Power were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Plug Power, the absence of good faith on

17

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Plug Power's Board at all relevant times.

54.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

55.    To discharge their duties, the officers and directors of Plug Power were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Plug Power were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Plug Power's own Code of Business Conduct and Ethics (the "Code of Conduct");

18

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Plug Power conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Plug Power and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Plug Power's operations would comply with all applicable laws and Plug Power's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth

above.

56.     Each of the Individual Defendants further owed to Plug Power and the shareholders the duty of loyalty requiring that each favor Plug Power's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Plug Power and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, directorial, and controlling positions with Plug Power, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Plug Power.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Plug Power was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Plug Power and was at all times acting within the course and scope of such agency.

**PLUG POWER'S CODE OF CONDUCT**

65.     The Company's Code of Conduct states it "sets forth expectations to help guide the actions and behaviors of all employees in our organization, including our subsidiaries and affiliates." The Code of Conduct further states that "the Code of Conduct is expected to be upheld

by non-employee members of the Board, as well as contractors, vendors, suppliers, consultants and other parties doing business with Plug Power."

66.     In a section titled "Communication," the Code of Conduct states, in relevant part:

As a publicly traded company, our organization must also comply with a variety of regulations that promote transparency in financial markets and the accuracy of information shared with the investment community. The reports and documents that we file with or furnish to the Securities and Exchange Commission, and our earnings releases and similar public communications made by our organization, must include fair, timely and understandable disclosure. It is therefore critical that the information shared with the public is managed by authorized members of the Company. Unless otherwise designated to do so by the senior leadership of our organization, no employee shall be authorized to issue public statements on behalf of Plug Power. This includes the prohibition of sharing confidential or proprietary Company information on social media and other internet forums as well as refraining from answering inquiries from members of the press. If you are contacted for Company information meant to be shared in a public forum, you should decline to comment and refer the inquiry to senior leadership or Human Resources.

67.     In a section titled "Accuracy of Company Records," the Code of Conduct states:

Our organization prepares and utilizes a variety of documents and records in the course of doing business. Specific examples include: financial reports, employee timecards, expense reports, corporate books, contracts and a variety of other such documents and records. These documents and records are critical to help guide business decision making while also having financial implications to business operations. Our organization also utilizes both internal and external auditor partners to validate the integrity, reliability and accuracy of Company records As such, Plug Power employees are responsible to ensure the integrity of these records by contributing accurate and timely data. No director, officer or employee may cause Plug Power to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer or employee may create any false or artificial documentation or book entry for any transaction entered into by Plug Power. Any purposeful falsification of Company documents will be considered as misconduct and will lead to disciplinary action up to and including termination of employment.

68.     In a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

Plug Power recognizes and respects the right of its directors, officers and employees to engage in outside activities that they may deem proper and desirable, provided that these activities do not impair or interfere with the performance of their duties

to the Company or their ability to act in Plug Power's best interests. A "conflict of interest" occurs when a director's, officer's or employee's personal or outside professional interest interferes with Plug Power's interests…

\*\*\*

Any transaction or relationship that reasonably could be expected to give rise to a conflict of interest should be reported promptly to Human Resources. Actual or potential conflicts of interest involving a director, executive officer or member of the Legal Department should be disclosed directly to the Compliance Officer and Chair of the Board of Directors.

To prevent conflicts of interest, the Company has adopted a Conflicts of Interest Policy, which is distributed to employees and available in the Employee Handbook.

If you are uncertain whether a conflict of interest exists, you should consult with the Compliance Officer, whose contact information is stated in the Company's Conflicts of Interest Policy.

69.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

Plug Power seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting Plug Power's business or in performing his or her day-to-day Company duties, nor shall any director, officer or employee instruct others to do so.

If you become aware of the violation of any law, rule or regulation by the Company, whether by its directors, officers, employees, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the Compliance Officer. While it is the Company's desire to address matters internally, nothing in this Code of Conduct should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. Nothing contained in the Code of Conduct, any agreement you have entered into with the Company, or any other Company policy limits your ability, with or without notice to the Company, to: (i) file a charge or complaint with any federal, state or local governmental agency or commission (a "Government Agency"); (ii) communicate with any Government Agency or testify, participate or otherwise assist in any investigation or proceeding that may be conducted by any Government Agency, including by providing information or documents not subject to attorney-client privilege; (iii) discuss or disclose information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that you have reason to believe is unlawful; or

23

(vi) testify truthfully in a legal proceeding . Any communications and disclosures related to these matters must be consistent with applicable law and the information disclosed must not have been obtained through a communication that was subject to the attorney-client privilege (unless disclosure of that information would otherwise be permitted consistent with such privilege or applicable law). The Company will not limit any right you may have to receive an award pursuant to the whistleblower provisions of any applicable law or regulation for providing information to the Securities and Exchange Commission or any other Government Agency. Any provisions of any agreement between the Company and any current or former employee that is inconsistent with the above language or that may limit or interfere with the ability of any person to receive an award under the whistleblower provisions of applicable law will not be enforced by the Company.

70.    In a section titled "Seeking Guidance and Reporting Concerns," the Code of

Conduct states, in relevant part:

Because the Code of Conduct cannot address every situation, you are expected to seek guidance whenever you are unsure of the correct course of action. There are several means of asking questions related to the Code of Conduct and to raise concerns. All employees are obliged to report possible violations of law, the Code of Conduct or any other Company policy or procedure.

As an employee, you have the option of speaking with several members of our organization at your discretion including: your supervisor, Human Resources, the Compliance Officer, Legal or any other member of senior management. Refer to the Company's Whistleblower Policy for more information regarding reporting concerns.

The Company prefers that officers and employees, when reporting suspected violations of the Code of Conduct, identify themselves to facilitate the Company's ability to take steps to address the suspected violation, including conducting an investigation. However, the Company also recognizes that some people may feel more comfortable reporting a suspected violation anonymously.

An officer or employee who wishes to remain anonymous may do so, and the Company will use reasonable efforts to protect confidentiality. If a report is made anonymously, however, the Company may not have sufficient information to investigate or evaluate the allegations. Accordingly, persons who report suspected violations anonymously should provide as much detail as they can to permit the Company to evaluate the allegation and, if it deems appropriate, conduct an investigation….

***

Our organization is committed to the prompt and comprehensive investigation of

reported concerns. In addition, all employees and business partners are expected to provide their full cooperation with the investigatory process, including providing truthful and accurate information to the best of their knowledge. Based upon the findings of each investigation, appropriate remedial action will be taken to uphold the Code of Conduct as well as other applicable polices for the benefit of all employees and business partners.

71.    In a section titled "Insider Trading," the Code of Conduct states:

Employees, officers and directors who have material non-public information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To help ensure that you do not engage in prohibited insider trading and avoid even the appearance of an improper transaction, the Company has adopted an Insider Trading Policy, which is distributed to employees and is also available from the Legal Department.

If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the Compliance Officer, whose contact information is stated in the Company's Insider Trading Policy before making any such purchase or sale.

72.    In a section titled "Protection and Proper Use of Corporate Assets," the Code of Conduct states:

Employees, officers and directors should seek to protect the Company's assets. Theft, carelessness and waste have a direct impact on the Company's financial performance. Employees, officers and directors must use the Company's assets and services solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else.

73.    In a section titled "Monitoring Compliance and Disciplinary Action," the Code of Conduct states:

The Company's management, under the supervision of its Board or a committee of the Board or, in the case of accounting, internal accounting controls, auditing or securities law matters, the Audit Committee, shall take reasonable steps to (i) monitor compliance with the Code of Conduct, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code of Conduct.

Disciplinary measures for violations of the Code of Conduct will be determined in the Company's sole discretion and may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service, and restitution.

The Company's management shall periodically report to the Board or a committee of the Board on these compliance efforts including, without limitation, alleged violations of the Code of Conduct and the actions taken with respect to violations.

74.    In a section titled "Waivers and Amendments," the Code of Conduct states:

No waiver of any provisions of the Code of Conduct for the benefit of a director or an executive officer (which includes, without limitation for purposes of the Code of Conduct, Plug Power's principal executive, financial and accounting officers) shall be effective unless: (i) approved by the Board of Directors or, if permitted, a committee thereof; and (ii) if applicable, such waiver is promptly disclosed in accordance with applicable U.S. securities laws and/or the rules and regulations of the exchange or system on which the Company's shares are traded or quoted.

Any waivers of the Code of Conduct for other employees may be made by the Compliance Officer, the Board or, if permitted, a committee thereof.

All amendments to the Code of Conduct must be approved by the Board or a committee thereof and, if applicable, must be promptly disclosed in accordance with applicable U.S. securities laws and/or the rules and regulations of the exchange or system on which Plug Power's shares are traded or quoted.

75.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct and law.

**AUDIT COMMITTEE CHARTER**

26

76.     The Company maintains an Audit Committee Charter. In a section titled "Purpose,"

the Audit Committee Charter states the following:

> The purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Plug Power Inc. (the "Company") are to:
>
> • oversee the accounting and financial reporting processes of the Company, the audits, and the integrity of the Company's financial statements;
>
> • take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors");
>
> • oversee the performance of the Company's internal audit function; and
>
> • prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

77.     In a section titled "Responsibilities and Authority," under a subheading titled

"Audited Financial Statements and Annual Audit," the Audit Committee Charter states, in relevant

part:

> The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the Independent Auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements. The Audit Committee shall also review and discuss with the Independent Auditors the nature of each identified critical audit matter, the auditor's basis for identifying a matter as a critical audit matter and how each such identified matter will be described in the auditor's report.
>
> • The Audit Committee must review:
>
> (i) any analyses prepared by management, the internal auditors, if any, and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial

27

statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls including any special audit steps taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

***

• If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the CEO and CFO of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

78.    In the same section, under a subheading titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter states:

• The Audit Committee shall discuss with management and the Independent Auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) any such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to PCAOB AS 4105: Reviews of Interim Financial Information, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

79.    In the same section, under a subheading titled "Earnings Press Releases," the Audit Committee Charter states:

• The Audit Committee shall discuss the Company's quarterly earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

80.      In the same section, under a subheading titled "Risk Assessment and Management,"

the Audit Committee Charter states:

• The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to financial, accounting and financial statement risk is assessed and managed by management.

• The Audit Committee shall periodically review the Company's major risk exposures, including financial, operational, privacy, security, cybersecurity, competition, hedging and accounting risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

• With respect to oversight of management of cybersecurity risks, the Audit Committee shall obtain and review reports on data management and security initiatives and significant existing and emerging cybersecurity risks, including material cybersecurity incidents, the impact on the Company and its stakeholders of any significant cybersecurity incident, and any disclosure obligations arising from any such incidents.

81.      In the same section, under a subheading titled "Regular Reports to the Board," the

Audit Committee Charter states:

• The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the performance and independence of the Independent Auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

82.      In the same section, under a subheading titled "Audit Related Legal and Regulatory

Compliance," the Audit Committee Charter states:

• The Audit Committee may discuss with management legal or regulatory matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its policies and procedures for complying with legal and regulatory requirements.

83.      In violation of the Audit Committee Charter, the Individual Defendants conducted

29

little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

84.     Plug Power is an energy company which builds hydrogen ecosystems such as hydrogen storage and production equipment for customers in the electric mobility market. Since its inception in 1997, the Company has deployed more than 74,000 fuel cell systems and currently operates more than 274 fueling stations. Plug Power also builds hydrogen production plants throughout the United States.

85.     Plug Power's revenue is comprised of sales related to infrastructure and equipment, services relating to fuel cell systems and its infrastructure, Power Purchase Agreements ("PPAs"), and fuel delivered to customers. Plug Power maintains long-term agreements to supply hydrogen fuel to customers such as Amazon and Walmart, which account for a large portion of the Company's revenue. The Company previously lacked the ability to produce enough liquid hydrogen itself to fulfill its obligations independently. In order to meet its contractual obligations, the Company purchased liquid hydrogen from third party suppliers at a high cost, reselling it to customers at a loss. As a result, the Company sustained negative margins on its fuel delivery

30

business.

86.    Plug Power initiated a "vertical integration" plan in the beginning of 2019 to mitigate these losses. The plan's aim was to improve the Company's ability to supply its own hydrogen fuel that it can then distribute to its network of customers. The strategy involved the construction of several liquid hydrogen plants across the United States. The first plant was the Georgia Plant, which was set to supply 15 TPD. The Georgia Plant was central to the overall success of the vertical integration plan, as it would signify proof of the Company's ability to operate internally in its production of hydrogen products on a large scale. The success of the Georgia Plant would also reduce the Company's reliance on purchasing hydrogen from third parties and improve the margins on their fuel delivery business.

*Plug Power's Production Timelines Were Unreasonable and the Company Faced Significant Setbacks*

87.    The Georgia Plant was integral to the Company's vertical integration plan, as it was set to "reinforce Plug's dominance in green hydrogen." The Georgia Plant was expected to utilize eight 5-megawatt electrolyzers designed to split water into hydrogen and oxygen before liquefying the hydrogen and then transporting it to fueling stations. Plug Power intention was to use components manufactured in-house or at other facilities owned by the Company to complete construction of the Georgia Plant. The electrolyzers used to create liquid hydrogen for example were expected to come from Plug Power's Vista Technology Park facility in Slingerlands, New York.

88.    Originally, it was announced that the Georgia Plant would be producing 15 TPD of liquid hydrogen by the second quarter of 2023.

89.    This timeline however was not feasible. To build a liquid hydrogen plant requires permitting, construction, commissioning, equipment revies and the installation and testing of

31

liquefiers and cold box systems. The industry standards for such plants were approximately four years.

90.    Plug Power's Georgia Plant was not producing liquid hydrogen by June 30, 2023. Instead, the Company stated the Georgia Plant would begin production by August 9, 2023. The delay was reportedly due to setbacks in productivity due to heat levels and utilizing learnings from other sites.

91.    According to FE1, the delays were actually due to Plug Power not meeting its financial obligations to vendors. FE1 specified that the vendors did not receive payments which plagued the Company's ability to obtain the necessary parts for battery cell assembly. FE1 made multiple calls to relevant departments within the Company but could not get a response or follow-up communications. FE1 also highlighted that Mindnich was aware of the situation and alleged he was doing his best to convey the message to others, including Defendant Marsh.

92.    According to FE1 Defendant Marsh and Middleton prioritized substantial quarterly bonuses, allocating funds to themselves while the Company had limited resources available for supply procurement, vendor payments, investment in hydrogen facilities and meeting customer requirements.

93.    FE1 highlighted that the Company experienced shortages of hydrogen fuel due to lack of production of the non-operational plants in Georgia and Tennessee. The subsequent impact on profitability further contributed to why the Company was behind schedule.

94.    FE2 tried to assist the Company in covering certain costs and ordering parts through other vendors. FE2 resolved one issue by writing a check to ensure delivery of parts that the Company did not provide payment for. FE2 shared that the work on Plug Power's Kodak Park facility was ultimately completed by outside sources. FE2 highlighted that Plug Power's

challenges with paying vendors or contractors corresponded with a cybersecurity breach the Company face which required ransom to be paid to access accounts. FE2 ultimately stopped working for the Company because the Company failed to pay approximately $500,000 in invoices from FE2.

95.     FE3 provided insight into the operational issues plaguing the Company. FE3 stated that Plug Power's senior management would make decisions without key information from ground operations. According to FE3, the Company made sales announcements that made FE3 question whether the Company could fulfill the commitments.

96.     FE3 explained that the Company faced recurring equipment quality issues that were not addressed though operational procedures. as Among these issues were leaking stacks, which would be addressed by replacing faulty parts as opposed to conducting adequate checks. Insufficient procedures perpetuated the quality issues.

97.     FE4 noted issues at Plug Power's West Concord facility were the result of a lack of technical expertise and recurring assembly errors with electrolyzers. These errors included incorrect sizes and hydrogen components. According to FE4, Vice President of Engineering Monjid Hamdan ("Hamdan") was facing difficulties with the electrolyzers due to the Company's failure to pay vendors, which resulted in order fulfillment issues. These problems continued through the end of FE4's employment with Plug Power.

98.     Furthermore, FE6 stated that the delays at the Georgia and Tennessee plants were due to quality and engineering issues. FE6 noted that the production delays were associated with substantial problems with the Cold Box (a core mechanical component used to liquify hydrogen production). FE6 shared that there were significant difficulties getting the Cold Box operational at the Georgia Plant. Furthermore, the Company was facing challenges with operation management

33

control.

99.    FE6 shared his belief that Plug Power lacked the expertise to connect the Cold Box. FE6 was part of conversations with internal leadership about the timeline for hydrogen production. Discussion centered achieving the required temperature to produce hydrogen. FE6 stated the process in trying to get the right temperature amounted to trial and error. It was FE6's belief that the Company was "in over their heads."

100.    On August 23, 2023, the Georgia Plant still had not begun hydrogen production.

101.    On October 11, 2023, the Company pushed the expected hydrogen production start date again, revealing, "[w]e're continuing to see progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end,"

102.    On January 23, 2024, Plug Power announced the Georgia Plant had finally started production of liquid green hydrogen. The total delay was approximately seven months from the initial deadline of June 2023.

**False and Misleading Statements**

*May 9, 2023 1Q'23 Form 10-Q*

103.    On May 9, 2023, the Company filed its quarterly financial and operational results on Form 10-Q with the SEC for the quarterly period ended March 31, 2023 (the "1Q'23 10-Q"). The 1Q'23 10-Q was signed by Defendants Marsh and Middleton and attached certifications pursuant to Rule 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Marsh and Middleton attesting to the accuracy of the 1Q'23 10-Q and that "the financial statements, and other financial information included in this [1Q'23 10-Q] report, fairly present in all material respects the financial condition, results of

operations and cash flows of the registrant as of, and for, the periods presented in this report."

104.   Under the heading "Recent Developments" and under the subheading titled "Inflation, Material Availability and Labor Shortages," the 1Q'23 10-Q disclosed, in relevant part:

Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those that supply materials in very limited supply worldwide, whose loss to us could have a material adverse effect upon our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs or incorrect forecasting could present challenges to those strategies despite best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. In cases where we have single sourced suppliers (typically due to new technology and products) or there have been worldwide shortages due to global demand, we have worked to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession and the demand for our product decreases, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time.

### *May 9, 2023 Press Release for 1Q'23*

105.   That same day, the Company issued a press release reporting first quarter results of the fiscal quarter ended March 31, 2023, (the "1Q'23 Press Release"). The 1Q'23 Press Release shared overly optimistic expectations for production of liquid hydrogen by the second quarter of 2023. The disclosures and expectations stated, in relevant part:

***Plug's Georgia Liquid Green Hydrogen Plant Will Complete Commissioning and Continue to Ramp to Liquid Production throughout Q2***: The plant has been brought online in less than a year since issuing the full EPC contract (engineering, procurement and construction contract), marking a new industry standard for the construction timeline of a liquid hydrogen plant.

\* \* \*

*We expect to commission 200+ TPD by 4Q23 / 1Q24 and 500TPD by year-end 2025. Based on learnings in Georgia, presently it takes six months to get plants from commissioning to full production.* Plug's green hydrogen generation network buildout should accelerate the energy transition while driving meaningful margin enhancement for Plug. To clarify the impact of this strategy, with a forecasted full year average customer demand of 65 tons of hydrogen fuel delivered per day in 2023, Plug would be able to achieve $100 million of gross margin improvement annually by sourcing all hydrogen internally from our plant network. We expect further gross margin expansion toward our financial targets as additional green hydrogen plants come online in 2024 and beyond.

\* \* \*

*Georgia: Plug has made significant strides in ramping up liquid hydrogen production, with plans to begin production in the second quarter of 2023.* In less than a year since the arrival of crews on site, Plug is set to launch the first green hydrogen production plant in the United States, breaking the industry standard timeline of 48 months. . . .

36





This plant represents a major achievement as Plug is turning on the first commercial scale green hydrogen plant in the United States. Learnings from the construction and commercial operations at Georgia are proving to be invaluable as Plug optimizes future plant design, progresses with prospective electrolyzer customers, and diligence with strategic partners.

### *May 9, 2023 1Q'23 Earnings Call*

106.    On May 9, 2023, the Company held an earnings call with investors and analysts to discuss its financial results for the fiscal quarter ended March 31, 2023 (the "1Q'23 Earnings Call"). Participants on the call included Defendants Marsh, Middleton, and Shrestha.

107.    Defendant Marsh shared expectations of full production for the Geogia Plant by the end of June 2023. Defendant Marsh touted the Company's ability to deliver on the timeline goals for not only the Georgia Plant but also for plants in Texas and New York. Defendant Marsh stated,

37

in relevant part:

> [O]ur plants already producing gases hydrogen for our customers, and ***we expected to achieve full production by the end of June.*** Although we always strive for greater speed, it's really worth noting, we accomplished what we've accomplished since issuing full notice to proceed under our EPC contract full production in just 48 weeks. This is a remarkable feat considering that conventional gas companies, and I was sitting at Syra, we've been listening to one CEO talking about 6 years, they usually estimate 4 years of a project of this scale.
>
> Additionally, ***by the end of June, our Georgia plant, with the largest green hydrogen play in the world that utilizes electrolyzers. That's a significant achievement.***
>
> *   *   *
>
> One of the real competitive advantage is the infrastructure we've established in Rochester and Vista, which enables us to support our business growth. And our customers really do recognize our ability to deliver our promises, thanks to the tools and facilities we possess. ***Our ability to construct green hydrogen plants is evident in Georgia***, and we plan to further demonstrate this in Texas and New York, which will eliminate any doubts about our capabilities. I'm going to be walking Georgia today, I'm excited.

***June 14, 2023 Analyst Day***

108.    On June 14, 2023, the Company hosted an "Analyst Day" at its Gigafactory in Rochester, New York.

109.    During the "Analyst Day," Defendant Marsh stated the following regarding the timeline for production at the Georgia Plant, in relevant part:

> And I think most of you know, I usually don't say things like that, but it's really touched me this week. And I think part of that probably has to do, I was in Georgia this week. And I'm going to -- I was at a CERAWeek all in the early March probably with many of you. And at CERAWeek, there were lots of traditional fossil fuel companies and traditional hydrogen companies talking about it takes 4 to 5 years to build a hydrogen plant. ***So I'm walking Georgia with the Head of S&P. We're down there. I'm down there to thank them for everything they've done and to really kind of enjoyed looking at this 15-ton per day liquid hydrogen plant with electrolyzers where there's nothing like in the world. And we're going to have another Analyst Day down there in August because we really want to bring you to Georgia in August.***
>
> ***And I walk that plan[t] and people tell me the experts told me it couldn't be done.***

38

* * *

*So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait.*

*August 9, 2023 2Q'23 Form 10-Q*

110.    On August 9, 2023, Plug Power filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2023 (the "2Q'23 10-Q"). The 2Q'23 10-Q was signed by Defendants Marsh and Middleton and attached SOX certifications signed by Defendants Marsh and Middleton attesting to the accuracy of the 2Q'23 10-Q and that "the financial statements, and other financial information included in this [2Q'23 10-Q] report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

111.    Under the heading "Recent Developments," under the subheading titled "Inflation, Material Availability and Labor Shortages," the 2Q'23 10-Q disclosed, in relevant part:

Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing is very volatile and influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs, new product serviceability trends, or incorrect forecasting could present challenges to those strategies despite best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region

39

that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand), we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. We continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives.

***August 9, 2023 Press Release for 2Q'23***

112.    On August 9, 2023, Plug Power issued a press release reporting its earnings for the quarterly period ended June 30, 2023 (the "2Q'23 Press Release"). The 2Q'23 Press Release continued to tout the unrealistic timeline for the Georgia Plant. The press release stated, in relevant part:

> Plug's Georgia green hydrogen plant reaching major milestone: We are continuing to optimize and ramp-up the plant. ***Final commissioning activities are underway to reach 17.5 tons per day (TPD) of production on site during Q3 2023.*** As Georgia produces at its full capacity, this is expected to cut our fuel margin loss by as much as half from Q2 to Q4 2023. . . . ***As production from our Georgia plant is utilized in the 2H 23, and we recommission the hydrogen plant currently under unplanned maintenance, we should see notable improvement in fuel margin beginning in the second half of the year***.

113.    The statements in paragraphs ¶¶ 103-112 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was not paying its suppliers; (2) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (3) these supply shortages were causing the Company's Georgia Plant to experience delays; (4) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of

June; and (5) the Georgia Plant would not be ready to start producing hydrogen until January 2024. As a result of the forgoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

#### August 9, 2023 2Q'23 Earnings Call

114.    On August 9, 2023, the Company held an earnings call to discuss its financial results for the fiscal quarter ended June 30, 2023 (the "2Q'23 Earnings Call"). Participants on the call included Defendants Marsh, Middleton, and Shrestha.

115.    The June 2023 deadline for the Georgia Plant to begin to produce liquid hydrogen had passed without an explanation. Instead, Defendant Shrestha stated that "*we are going to be producing liquid here in the month of August*. We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time."

116.    On this news, the price of the Company's common stock fell $1.70 per share, or approximately 15.8% from a closing price of $10.75 per share on August 9, 2023, to a closing price of $9.05 per share on August 10, 2023. However, the Individual Defendants continued to obfuscate the truth about the delay of the Georgia Plant producing liquid hydrogen as the result of Plug Power's cash flow and operational challenges.

117.    For example, during the 2Q'23 Earnings Call, Defendant Shrestha attempted to assure investors that the Company was close to production. Defendant Shrestha's statements, in relevant parts, are as follows:

> So again, I think we're fairly -- look, we feel very confident that we're going to be producing liquid in Q3. Right now, we're essentially going through ramping up electrolyzer, right? We've actually tried to electrolyze this one. You know that we've been producing gaseous hydrogen there with our gaseous hydrogen plant. We're in a process of actually ramping up our liquefiers in a process of cooling down the liquefaction trains.

So again, that's why we're hosting our Analyst Day there on August 23, right, so that we can actually show to you all exactly what's happening there and what's going on. So at the moment here, are we producing liquid? *We're not producing liquid today, but we are essentially ramping up the electrolyzer on path to be able to produce that liquid.* And Jeff, one of the key things here, right, I do want to stress this one particular point is, obviously, look, and I'm just going to take the point that's an elephant in the room, if you would. We clearly recognize that we've been 3 to 6 months behind than what we originally wanted it to be. But having said that, this plant is still coming online in 12 months since we actually issued the EPC contract, number one.

\* \* \*

*So long story and a quick comment, we are going to be producing liquid here in the month of August.* We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time.

And again, one of the things we want to make sure, right? So for us, getting Georgia up and running and getting production in Georgia, it also has to be done the right way and really leverage that learning as we start to think about building our plant in Texas, as we're building our plant in New York as well, right? So that's essentially what I would say. And also, another thing you need to kind of keep in mind, right, is we've been pushing just so you guys know, in order to be able to get this plant built in 12 months versus what the industry average of 48 months is, we've actually been pushing folks, but it's the month of July and August.

And on some level, the productivity does go down because it's 100 degrees outside and people have to actually take break and really be able to cool down and then go back on site. And just to give you a sense, the team was on site at 4:30 a.m. today, right, just to make sure that things were happening. So that's another factor. There's nothing anyone can really do about that, reduce productivity in the month of June, July and August in Georgia, and that certainly has played a bit of an impact here as well.

***August 23, 2023 Analyst Day***

118.    On August 23, 2023, the Company hosted an "Analyst Day" event in Georgia in connection to the Company's Georgia Plant. Defendants Marsh and Shrestha represented the Company at the event.

119.    In connection with the Analyst Day Event, the Company issued a press release, which stated, in relevant part, that:

LATHAM, N.Y., Aug. 23, 2023 (GLOBENEWSWIRE) -- Plug Power Inc.

42

(NASDAQ: PLUG), a global leader in comprehensive hydrogen solutions for the green hydrogen economy, today will host its Analyst Day *showcasing the accomplishments to date of its 15 ton per day (TPD) liquid green hydrogen plant in Camden County, Georgia.* Plug will share how the Georgia plant strengthens Plug's long-term position as the global leader in green hydrogen production and supplier of electrolyzers. The day's agenda will include a tour of the hydrogen plant.

\* \* \*

The insights Plug gained designing and constructing this plant are expected to result in design optimization and lower capital expenditure for the company's other plants currently under construction. *As the Georgia plant's hydrogen production ramps up, it is anticipated to improve Plug's fuel margin meaningfully from Q2 to Q4 2023.*

120. During the presentation, the Company provided a slide touting that the new Georgia Plant would help "cut our fuel margin loss by as much as half from Q2 to Q4 2023." The slide is as follows:



## Anticipated Impact of Plug's Green Hydrogen Strategy

As Georgia produces at its full capacity, this is expected to cut our fuel margin loss by as much as half from Q2 to Q4 2023

Plug expects its green hydrogen network to produce hydrogen at a cost that is one-third of our third-party purchases

By sourcing all hydrogen internally from its plant network, Plug is expected to achieve up to $100 million of gross margin improvement annually, based on a forecasted full year average customer demand of 65 tons of hydrogen per day.



Georgia Green Hydrogen Plant – April 2023

***October 11, 2023 Plug Power's Annual Symposium***

121. On October 11, 2023, the Company conducted its annual symposium at its Vista manufacturing facility in Slingerlands, New York.

122.     During the symposium, Defendant Marsh attempted to reassure investors that the Georgia Plant would be producing liquid hydrogen in the near term. Defendant Marsh stated, in relevant part:

> And on hydrogen, in 2020, we had nothing. There's dream. I went back and look at 2020 slides, which when I look at and found out we're beating -- the 2019 slides, we're beating the numbers. We told folks where we're going to be in 2019. I think we said we were going to be $1 billion of revenue in 2024. We're going to do that this year. But also, we talked about -- we're thinking about how we would build hydrogen plants. We have a plant in Tennessee. *I wish I could tell you, Georgia was putting out liquid today, somewhere between 11/15 and 12/31, when the coal [sic] boxes – coal [sic] box is finally commissioned, where we're going through a process now of drying it out.* It's a $100 million piece of equipment. We really want to make sure it's done right. But that work is about to be completed. It's the biggest electrolyzer plant in the world.
>
> We've learned, and it's -- every day, I learn a little bit more, we had to test 8,000 pipes in this facility. We had to test 3,000 electrical loops to make sure everything was right. We're drying out coal boxes. *It hasn't been easy, but I can tell you, Sanjay, myself, Tim Cortes, have become experts in what it takes to build, which is the easy part, and really what it takes to commission*.

123.     The statements in paragraphs ¶¶ 117-122 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia,* that: (1) the Company was not paying its suppliers; (2) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (3) these supply shortages were causing the Company's Georgia Plant to experience delays; (4) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of June; and (5) the Georgia Plant would not be ready to start producing hydrogen until January 2024. As a result of the forgoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*November 9, 2023 Press Release for 3Q'23*

44

124.    On November 9, 2023, Plug Power issued a press release in connection to its earnings for the quarterly period ended September 30, 2023 (the "3Q'23 Press Release"). The 3Q'23 Press Release pushed back the expected completion date for the Georgia Plant again, stating that expected completion would be by the end of the year, six months after the initial completion date. The 3Q'23 Press Release stated, in relevant part:

> Georgia green hydrogen plant nearing major milestone: ***We are completing the final step of the commissioning process for the liquefiers/cold box. Liquid production is anticipated between November 15th and year-end.***

125.    On this news, the price of the Company's common stock fell $2.40 per share, or approximately 40.5% from a closing price of $5.93 per share on November 9, 2023, to a closing price of $3.53 per share on August 10, 2023. However, the Individual Defendants continued to obfuscate the truth about the delay of the Georgia Plant producing liquid hydrogen as the result of Plug Power's cash flow and operational challenges.

### *November 9, 2023 3Q'23 Form 10-Q*

126.    On November 9, 2023, Plug Power filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2023 (the "3Q'23 10-Q"). The 3Q'23 10-Q was signed by Defendants Marsh and Middleton and attached SOX certifications signed by Defendants Marsh and Middleton attesting to the accuracy of the 3Q'23 10-Q and that "the financial statements, and other financial information included in this [3Q'23 10-Q] report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

127.    Under the heading "Recent Developments," under the subheading titled "Inflation, Material Availability and Labor Shortages," the 3Q'23 10-Q disclosed, in relevant part:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply

materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing has been volatile and may be influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. For example, although we believe the current hydrogen supply challenge is a transitory issue, we have experienced supply chain issues relating to the availability of hydrogen, including but not limited to suppliers utilizing force majeure provisions under existing contracts, which has negatively impacted the amount of hydrogen we have been able to provide under certain of our supply and other agreements. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels. However, ongoing changes to, and evolution of, our products designs such as simultaneous design/build efforts and new product serviceability trends, or incorrect forecasting or updates to previously forecasted volumes could present challenges to those strategies despite best efforts in leveraging supplier relationships and capabilities. With respect to production, although we have experienced less cost pressures from global energy prices and inflation, those factors could rise again and there could be a negative impact to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand), we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. In addition, during the fourth quarter of 2023, we are continuing discussions with suppliers to modify terms of our supply agreements, which may impact the timing of when we receive shipments of certain supplies or result in other supply chain issues. However, we continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives. With respect to its service business, the Company has experienced inflationary increases in labor, parts and related overhead. Accordingly, the Company increased its estimated projected costs to service fuel cell systems and related infrastructure, which resulted in an increase in the provision for loss contracts related to service during the third quarter of 2023. If these trends continue, we may have to record additional service

loss provisions in the future. We anticipate bookings and revenue will be uneven in the near-term while we pursue sales opportunities and seek to build our liquefier backlog.

***November 9, 2023 3Q'23 Earnings Call***

128.    On November 9, 2023, the Company held an earnings call with investors and analysts to discuss its financial results for the fiscal quarter ended September 30, 2023 (the "33Q'23 Earnings Call"). Participants on the call included Defendants Marsh, Middleton, and Shrestha.

129.    Defendant Marsh stated, in relevant part:

To service our customers, Plug has been moving hydrogen from the West Coast to the East Coast. This has been a yeoman's effort and has been accomplished while reducing the core cost of hydrogen compared to the second quarter. Good news is the network has now stabilized and many of these planned outages have subsided, plus additional capacity will be coming online. We expect our Tennessee plant will be back online producing hydrogen by the end of the year.

This plant when fully operational provides about 20% of our production needs. One of our major suppliers is upgrading one of their facilities to allow the plant to operate at full nameplate capacity in the coming months. The plant output has been producing between 0% to 25% of capacity. ***We are continuing to see progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end.***

130.    The statements in paragraph ¶¶ 126-129 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was not paying its suppliers; (2) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (3) these supply shortages were causing the Company's Georgia Plant to experience delays; (4) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of June; and (5) the Georgia Plant would not be ready to start producing hydrogen until January 2024.

As a result of the forgoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH FULLY EMERGES

### November 16, 2023 J.P. Morgan Report

131. On November 16, 2023, J.P. Morgan issued a report following a meeting with Defendant Middleton in which "the company's outlook post-3Q earnings, options to strengthen its balance sheet, and path for margin improvement, was discussed. The J.P. Morgan report noted that the Georgia Plant was still not operational, and the Company's margins would be unable to improve until production at the Georgia Plant commenced.

132. On this news, the price of the Company's common stock fell $0.48 per share over the following three trading days, or approximately 11%, from a closing price of $4.35 per share on November 15, 2023, to a closing price of $3.87 per share on November 20, 2023.

### January 10, 2024, Baptista Research Report

133. The truth continued to emerge on January 10, 2024, when Baptista Research issued a report that revealed that "[t]he delays experienced in the Georgia facility indicate that there might be unforeseen operational challenges and learning curves that could potentially delay other projects, affecting the company's short-term production and revenue targets."

134. On this news, the price of the Company's common stock fell $0.32 per share, or approximately 8% from a closing price of $4.04 per share on January 10, 2024, to a closing price of $3.72 per share on January 11, 2024.

### January 17, 2024, Seeking Alpha Report

135. The truth fully emerged on January 17, 2024, when Seeking Alpha published a report identifying downgrades from analysts and concerns related to the Georgia Plant's buildouts.

Seeking Alpha included a report by Morgan Stanley from that same day which revealed, "Morgan Stanley analyst Andrew Percoco maintained his Underweight rating and $3 price target, anticipating downside to Plug's (PLUG) $2.1B revenue and 25% gross margin guidance for FY 2024 announced during its Q4 earnings call" and "further delays at Plug's green hydrogen production facility in Georgia could be announced, which would add to pressure on the growth and profitability profile of the company's green hydrogen business model."

136.    On this news, the price of the Company's common stock fell $0.30 per share, or approximately 9.9% from a closing price of $3.04 per share on January 16, 2024, to a closing price of $2.74 per share on January 17, 2024.

**THE INDIVIDUAL DEFENDANTS' KNOWLEDGE**

137.    Throughout the Relevant Period, the Individual Defendants were aware of the materially false and misleading nature of their statements and those statements disseminated in the name of the Company. The Individual Defendants' knowledge as to the false and misleading statements is evidence by publicly available information and the statements of confidential witnesses.

138.    According to FE1, Mindich was aware of Plug Power's failures in paying its vendors. FE1 states that Mindnich did his best to convey the news to others, including Defendant Marsh.

139.    FE4 notes that Mittelsteadt shared concerns that the production timeline for the Georgia Plant was not realistic with both Defendant Marsh and Defendant Middleton. FE4 shared that Mittlesteadt disagreed with Defendant Marsh on the issues of production forecast.

140.    FE4 also stated that Hamdan shared these concerns and openly discussed them in meetings. Despite these conversations, Defendant Marsh would claim any operational problems

49

would be resolved, despite the problems continuing. Defendant Marsh was also made aware of the operational issues at the Georgia Plant, yet proceeded to state the Company would be on schedule for its unrealistic timeline for production.

141.    FE6 shared that production delays were connected to substantial problems with the Cold Box. During FE6's role he reported to Jerry Cahill, VP of Finance, who reported directly to CFO Paul Middleton. Defendant Middleton would have, through his position, been informed of these delays and their causes.

## DAMAGES TO PLUG POWER

142.    As a direct and proximate result of the Individual Defendants' conduct, Plug Power will lose and expend many millions of dollars.

143.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

146.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached

their fiduciary duties to the Company.

147.    As a direct and proximate result of the Individual Defendants' conduct, Plug Power has also suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

148.    Plaintiff brings this action derivatively and for the benefit of Plug Power to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Plug Power, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

149.    Plug Power is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150.    Plaintiff is, and has been at all relevant times, a shareholder of Plug Power. Plaintiff will adequately and fairly represent the interests of Plug Power in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

151.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

152.    A pre-suit demand on the Board of Plug Power is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Marsh, Angle, Bonney, Helmer, Joggerst, Kenausis, Mahtani, McNamee, and Willis (the "Director-Defendants") and non-parties Colin Angle and Jose Luis Crespo ("Crespo")

51

(collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this complaint.

153.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

154.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused Plug Power to issue false and misleading statements which were intended to make Plug Power appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

155.    Additional reasons that demand on non-party Crespo is futile follow. Crespo is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with Plug Power, thereby rendering him not independent. As such, Crespo could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Crespo is therefore futile.

156.    Additional reasons that demand on Defendant Marsh is futile follow. Defendant

Marsh has served as a Company director since 2008 and as Chairman of the Board since October 2025. He previously served as the Company's CEO from 2008 until March 2, 2026. Defendant Marsh received handsome compensation for his role as CEO. Until recently, the Company provided Defendant Marsh with his primary occupation. Thus, as the Company admits, Defendant Marsh is not independent. As the Company's former highest officer and trusted Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Moreover, Defendant Marsh is a defendant in the Securities Class Action. For these reasons, too, Defendant Marsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Bonney is futile follow. Defendant Bonney has served as a Company director since 2023. He also serves as the Chair of the Audit Committee and as a member of the Regulatory Affairs Committee. Defendant Bonney has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Bonney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Helmer is futile follow. Defendant Helmer has served as a Company director since 2004. She also serves as the Chair of the Corporate Governance and Nominating Committee and the Regulatory Affairs Committee and as a member of the Audit Committee. Defendant Helmer has received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Helmer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Joggerst is futile follow. Defendant Joggerst has served as a Company director since July 2023. He also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. Defendant Joggerst has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Joggerst breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Kenausis is futile follow. Defendant Kenausis has served as a Company director since October 2013. He also serves as the Chair of the

Strategy and Financing Committee and as a member of the Audit Committee and the Compensation Committee. Defendant Kenausis has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Kenausis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161. Additional reasons that demand on Defendant Mahtani is futile follow. Defendant Mahtani has served as a Company director since 2022. She also serves as a member of the Audit Committee and the Strategy and Financing Committee. Defendant Mahtani has received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. For these reasons, Defendant Mahtani breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162. Additional reasons that demand on Defendant McNamee is futile follow. Defendant McNamee has served as a Company director since 1997 and as the Company's Lead Director since October 2025. Defendant McNamee previously served as the Chairman of the Board from 1997 until October 2025. He also serves as a member of the Compensation Committee, the Corporate

55

Governance and Nominating Committee, Regulatory Affairs Committee, and the Strategy and Financing Committee. Defendant McNamee has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant McNamee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163. Additional reasons that demand on Defendant Willis is futile follow. Defendant Willis has served as a Company director since 2003. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee, Corporate Governance and Nominating Committee, Regulatory Affairs Committee, and Strategy and Financing Committee. Defendant Willis has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Willis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164. Additional reasons that demand on the Board is futile follow.

165. Defendants Bonney (as Chair), Helmer, Kenausis, Mahtani, and Willis (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such,

they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

166.   In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

167.   Plug Power has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to

attempt to recover for Plug Power any part of the damages Plug Power suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

168.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169.    The acts complained of herein constitute violations of fiduciary duties owed by Plug Power's officers and directors, and these acts are incapable of ratification.

170.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Plug Power. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Plug Power, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

171. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Plug Power to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

172. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

173. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Plug Power's business and affairs.

175. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

176. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Plug Power.

177. In breach of their fiduciary duties owed to Plug Power, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was not paying

its suppliers; (2) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (3) these supply shortages were causing the Company's Georgia Plant to experience delays; (4) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of June; and (5) the Georgia Plant would not be ready to start producing hydrogen until January 2024. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

178.    The Individual Defendants further breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material facts.

179.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

180.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Plug Power's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

181.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Plug Power has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

183.    Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

184.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Plug Power.

186.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Plug Power that was tied to the performance or artificially inflated valuation of Plug Power or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

187.    Plaintiff, as a shareholder and a representative of Plug Power, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

188.    Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

189. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Plug Power, for which they are legally responsible.

191. As a direct and proximate result of the Individual Defendants' abuse of control, Plug Power has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Plug Power has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Plug Power in a manner consistent with the operations of a publicly held corporation.

195. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Plug Power has sustained and will continue to sustain significant damages.

196. As a result of the misconduct and breaches of duty alleged herein, the Individual

62

Defendants are liable to the Company.

197.    Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

198.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

200.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Plug Power to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

201.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

202.    Plaintiff, on behalf of Plug Power, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Marsh, Middleton, and Shrestha for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

203.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204.    Plug Power and Defendants Marsh, Middleton, and Shrestha are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these

63

violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Marsh's, Middleton's, and Shrestha's willful and/or reckless violations of their obligations as officers and/or directors of Plug Power.

205.   Defendants Marsh, Middleton and Shrestha, because of their positions of control and authority as officers and/or directors of Plug Power, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Plug Power, including the wrongful acts complained of herein and in the Securities Class Action.

206.   Accordingly, Defendants Marsh, Middleton, and Shrestha are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

207.   As such, Plug Power is entitled to receive all appropriate contribution or indemnification from Defendants Marsh, Middleton, and Shrestha.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Plug Power, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Plug Power;

(c)   Determining and awarding to Plug Power the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Plug Power and the Individual Defendants to take all necessary

actions to reform and improve Plug Power's corporate governance and internal procedures to comply with applicable laws and to protect Plug Power and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Plug Power to nominate at least five candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Plug Power restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

65

/s/*Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Richard Modjeski, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3/24/2026 __ day of March 2026.

DocuSigned by:

*Richard Modjeski*

DE3055B6070247C...

Richard Modjeski